Filed 11/23/22  Ferrera v. Terminix International CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION EIGHT

| | |
|---|---|
| ATLAS FERRERA,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>TERMINIX INTERNATIONAL, INC.,<br><br>        Defendant and Appellant. | B306273<br><br>Los Angeles County<br>Super. Ct. No. BC657474 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Norman P. Tarle, Judge.  Affirmed in part, reversed in part.

Law Offices of Steve A. Hoffman, Steve A. Hoffman; Law Offices of Brian J. Breiter, Brian J. Breiter, Chance J. Pardon; Esner, Chang & Boyer, Stuart B. Esner, Shea S. Murphy and Kevin K. Nguyen for Plaintiff and Appellant.

Hinshaw & Culbertson, Joshua G. Vincent, David J. Alfini, Frederick J. Ufkes and Filomena E. Meyer for Defendant and Appellant.

———————————

After being exposed to pesticides which were improperly applied by Terminix, Atlas Ferrera lost his sense of taste and smell.  He brought this action against Terminix, and a jury found in his favor and awarded him $8 million in damages.  Terminix moved for judgment notwithstanding the verdict (JNOV) and a new trial.  The trial court denied the JNOV motion and granted the motion for a new trial.  Ferrera appeals the order granting a new trial.  Terminix cross-appeals the denial of the JNOV motion, contending there is insufficient evidence to support the verdict.  We reverse the new trial order.  We find substantial evidence to support the verdict, which we affirm.

## BACKGROUND

At about 7:40 p.m. on May 1, 2015, appellant was in the bathroom at his place of employment, Larchmont Beauty (Beauty), when he noticed a smoky cloud entering the space.  Unbeknownst to appellant, at about this same time, at the Starbucks next door, an employee of Terminix was using a duster to apply a powdered pesticide called Alpine Dust into the cavity of a wall shared by Starbucks and Beauty.  On the Starbucks side, the wall was in a storage room; on the Beauty side it was in the bathroom.  Appellant was unaware of the application, in part because, although Terminix was required by law to inspect the walls before applying pesticides, Terminix's technician Mario Ortiz did not check Beauty's side of the shared wall to determine its integrity.  Appellant would later learn that Ortiz used the duster incorrectly, which permitted over-application of the Alpine Dust.

2

Appellant almost immediately began to feel ill and left the bathroom as quickly as possible, calling out to Beauty's owner Fred Cohanim. Cohanim also saw the smoke and the two men went to knock on the door of Starbucks. The men were concerned there was fire in Starbucks, but quickly realized this was not the case. According to Cohanim, the people inside Starbucks paid no attention to the knocking. Cohanim suggested they should call Starbucks and appellant did so. Soon thereafter appellant left work because he was not feeling well.

According to Ortiz, he heard the knocking after he finished his last treatment and was getting ready to leave. He opened the door and encountered an elderly man. The man insisted Ortiz accompany him to his business so he could show Ortiz "that whatever [Ortiz] was doing there was affecting him." Ortiz reluctantly went with Cohanim to the store next to Starbucks, where Cohanim took him to the bathroom and said, "Look what you've done." Ortiz saw dust, "[b]ut couldn't tell what kind of—what was it really." He did describe the dust as dark. Cohanim wanted Ortiz to clean it up, but Ortiz declined and told Cohanim to call his service manager or the Terminix branch manager Michael Kaiser.

Ortiz called and reported the encounter to his manager. Ortiz left the Beauty area at about 8:00 p.m.

Cohanim denied any such encounter occurred. No one responded to his knocking and so he returned to Beauty. When he checked the bathroom, the smoke slowly diminished, leaving something that looked like ashes, dust or powder on the floor, counter, and toilet seat cover in the bathroom.

Appellant, at home, became concerned about the symptoms he was experiencing. By 11:30 that night his symptoms were bad

enough that he went to an emergency room, where he complained of dizziness, nausea, headache, sneezing, nose bleeding and burning in his throat. Dr. Manon Kwan examined appellant and observed dried blood in appellant's nose, indicating recent bleeding and irritation. Based on appellant's history and symptoms, Dr. Kwan concluded that the bleeding had been caused by sneezing, which in turn had been caused by exposure to a chemical irritant. Dr. Kwan testified at her deposition, portions of which were played for the jury, that appellant's symptoms were consistent with exposure to a chemical irritant. Appellant was discharged from the emergency room a few hours after arriving.

Cohanim testified that the next morning a man in a Terminix uniform came to Beauty, saw the residue in the bathroom, and "said they are going to send someone to come and clean it up." This man was undoubtedly Terminix's branch manager Michael Kaiser. Although not determinative of our decision, Cohanim's testimony, while not entirely clear, can be understood as saying that the cleaning crew arrived while Kaiser was there, and that one of them was wearing a Terminix badge. Cohanim saw the cleaning crew using ordinary cleaning tools to clean up; there is no evidence they took any samples of the residue. No one from Terminix suggested to Cohanim that he take a sample and get it tested.

Kaiser acknowledged visiting Beauty. He explained he went there as a result of an email from the Terminix call center about a complaint from Cohanim. Kaiser inspected the bathroom but reported finding only ordinary household dust. Kaiser testified he saw no holes in the wall or other entry points for the

4

pesticides. There is no evidence Kaiser took a sample of this dust. Kaiser denied ordering a cleaning crew.

Kaiser told Cohanim he would send him an e-mail about the products used at Starbucks. Kaiser sent only an information sheet on Alpine Dust.

Eleven days after the smoke incident, appellant visited ear, nose, and throat specialist Dr. Andrew Berman, complaining of irritation in his mouth and nose and difficulty smelling. He said he had had a bloody nose. Dr. Berman examined appellant and observed a scab on one side of appellant's nose and a place where a scab had fallen off on the other side. Appellant also had some minimal irritation in his mouth. Based on appellant's account of being potentially exposed to toxic chemicals and his symptoms during his visit to the emergency room within a few hours of the exposure, Dr. Berman opined that a toxic chemical had entered and irritated appellant's nose. In Dr. Berman's opinion, it was the irritation from the chemical which caused sneezing, and the sneezing in turn exacerbated the irritation.

Dr. Berman administered a smell test and determined appellant had a diminished sense of smell. Dr. Berman opined appellant had scarring of the olfactory nerve. This was based on the bleeding in the nose and decreased sense of smell, as there was no other medical explanation, such as polyps, chronic disease or trauma. Dr. Berman pointed out the reported chemical exposure was the only thing which could account for the scarring. There is no medical treatment for a scarred nerve. Dr. Berman did not perform a biopsy to confirm this scarring, as the location of the biopsy would create a serious risk of infection.

Appellant also visited a neurologist, Dr. Jan Merman, who ordered an MRI for appellant. The procedure did not show a brain tumor or other brain abnormality.

Four years later, appellant returned to Dr. Berman. By that time, appellant's sense of smell was gone and he had lost his sense of taste as well. This lawsuit followed.

When appellant attempted to discover which pesticides, exactly, had been applied at Starbucks four years earlier, Terminix stated it had lost the report prepared by Ortiz, the technician who had applied Alpine Dust and two other pesticides. Terminix did provide the report prepared by another technician, Emiliano Caballero, who had applied pesticides at Starbucks earlier in the day. Terminix acknowledged Kaiser had visited Beauty the day after the incident and prepared a report, but it did not know what had happened to that report. Appellant was further hampered by the fact that Terminix had sent a cleaning crew to clean up the residue in Beauty's bathroom, but the crew either did not take or did not preserve any residue samples. Neither did Kaiser take any samples during his visit.

Based on some or all of these incidents, the trial court instructed the jury pursuant to CACI No. 204 that "You may consider whether one party intentionally concealed or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party." The key use of these inferences related to the composition of the "smoke" which appellant encountered in Beauty's bathroom.

Appellant eventually obtained a copy of Ortiz's report from the Department of Health, but the report was not fully and properly completed as required by law. Ortiz had not specified the amounts of the three pesticides he applied or the precise

locations where he applied them. The report stated Ortiz applied one of the pesticides, Cy-Kick, to the perimeter. Not only was this very vague, but it indicated an improper application of Cy-Kick, which is used only for perimeter treatment outdoors. Indoors, only spot treatments are permitted.

Ortiz testified that when his service manager and Kaiser asked him what had happened at the Starbucks, he gave them his "Treatment Sheet" and said, "This is what I did and nothing else." Ortiz acknowledged the form was missing required information. When Ortiz gave the form to Kaiser, however, Kaiser did not tell him the form was incompletely filled out or ask him about the missing information. Kaiser agreed he noticed the report was not complete as required by law but made no efforts to have Ortiz complete it.

When asked about the application of Alpine Dust, Ortiz stated Starbucks had informed him he should apply Alpine Dust into preexisting holes in a wall in the storeroom. When Ortiz arrived at Starbucks, he discovered the three holes had plastic tubes in them, devices called "insiders." The holes were at varying heights, with the lowest being 18 inches above the ground. Terminix's Jennifer Fox testified the presence of insiders indicated there had been an earlier pesticide application in the wall.

The report by Caballero, the other technician, was apparently more complete than Ortiz's, but his testimony showed inconsistencies and ambiguities as to the amount of pesticides he applied and his description of the areas to which he applied

pesticides. The pesticides he applied were PT221L, PT 565 and Temprid SC.[1]

Appellant retained toxicology expert Dr. Nachman Brautbar to testify about five of the six pesticides used by Terminix in the Starbucks. (There was no claim appellant could have inhaled the sixth pesticide, gel bait.) Terminix filed a motion in limine to preclude virtually all of Dr. Brautbar's testimony, but Dr. Brautbar was ultimately able to testify about the effects of the five pesticides applied by Terminix, which included pyrethrins, pyrethroids and diatomaceous earth. He also testified about other chemicals in the pesticides, including piperonyl butoxide, petroleum distillates, and formaldehyde.

Specifically, Dr. Brautbar testified he had treated patients exposed to pyrethrins and pyrethroids who later lost their sense of smell. He testified pyrethroids can cause the acute symptomatology appellant had. They can also cause loss of taste and smell. Dr. Brautbar identified the risks of acute pyrethrin exposure as irritation of the eyes, skin, oral mucosa, and nasal mucosa. Pyrethrins can also cause a loss of smell.

Dr. Brautbar also testified that part of the foundation for his opinion about pyrethrin was a case study referred to as the Gobba study. The case involved an Italian doctor exposed to

[1] In addition to being impeached with his deposition about the specific area where he applied the pesticides, Caballero kept using the term "back of the house" to describe the area he treated. He stated this was a term used by Starbucks to refer to the kitchen. Kaiser, however, testified that the "back of the house" at Starbucks was "considered anywhere not customer facing, where they might have stock or mops or supplies or things like that," which certainly sounds like it could include a storeroom.

pyrethrin and another chemical, who subsequently lost his sense of smell.  Based on that study, Dr. Brautbar agreed pyrethrins can cause some loss of taste.

Dr. Brautbar testified in some detail about diatomaceous earth, explaining it caused "irritation of the mucosa, which in some patients destroys the mucosa and causes scarring of the mucosa, and that later on may cause scarring to things under the mucosa."  He testified it was capable of causing a loss of smell.  He deferred to Dr. Berman "in terms of the exact mechanism of the loss of taste" caused by diatomaceous earth.

Finally, Dr. Brautbar testified Alpine Dust is a substance designed to bind to other materials and it can pick up and carry other chemicals.

Appellant's treating physician Dr. Berman also testified as an expert on appellant's behalf.  He was asked to connect the dots as to how chemicals in Terminix's pesticides caused appellant's loss of smell and taste.  Dr. Berman agreed the chemicals at issue were pyrethrins and pyrethroids, which are irritants, and also diatomaceous earth.  Dr. Berman described diatomaceous earth as "earth used for filtering, but if you look it under an electron microscope, it looks like you're walking on razor blades.  It's a natural way to keep ants from coming into your house." Appellant's counsel then asked, "So the diatomaceous earth and the pyrethroids and pyrethrins that you mentioned are irritants, how did that affect his loss of smell and taste?"  Dr. Berman replied, "So you get in there, and you beat up the protective exoskeleton, and then you put a poison in it, and the dust can have a poison on it as well, so it's like a poison dagger." Appellant's counsel asked, "Is that what happened to the mucosa" in his nose and mouth?  Dr. Berman agreed.  He also agreed that

was why appellant lost his sense of taste and smell. The doctor testified nothing could be done to bring back those senses.

In response to a motion in limine filed by Terminix, the trial court limited Dr. Berman's testimony about a prior patient who had suffered a complete loss of smell after being exposed to a fumigation for cockroaches. The trial court ruled the testimony could only be used to show Dr. Berman's expertise and experience.

Terminix offered an extensive defense, calling a number of its current and past employees as witnesses. Terminix also called its own toxicology expert Dr. Marion Fedoruk. Dr. Fedoruk did not agree with much of appellant's expert testimony. As relevant here, Dr. Fedoruk testified the Gobba study could not be used to prove causation, both because it was a study of a single patient and because it involved butoxyethanol, which Terminix had not applied.

Terminix also retained medical doctors to examine appellant. These doctors testified at trial but did not offer any alternative medical explanation for appellant's loss of smell or taste. Neurologist Dr. Edwin Amos did not examine appellant's cranial nerve No. 1, which pertains to the sense of smell. Everything was normal in Dr. Amos's examination. The ear, nose and throat doctor opined that appellant had not actually lost his sense of smell.

### APPEAL OF ORDER GRANTING A NEW TRIAL

Appellant challenges the trial court's new trial order, which states, under the heading "Expert Evidence," this is "one area in which the defense objection is well taken." In the statement of reasons, the trial court identifies three reasons for granting a new trial. As we discuss below, none of these reasons provide a

basis for affirming the order for a new trial.  We also consider and reject Terminix's claim that the trial court's instruction to the jury on suppression of evidence warranted a new trial.

The authority of a trial court in this state to grant a new trial is established and circumscribed by statute.  Code of Civil Procedure section 657[2] sets out seven grounds for such a motion: (1) irregularity in the proceedings; (2) misconduct of the jury; (3) accident or surprise; (4) newly discovered evidence; (5) excessive or inadequate damages; (6) insufficiency of the evidence; and (7) error in law. (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633 (*Oakland Raiders*).) Section 657 provides: "When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated."  As the California Supreme Court has explained: " '[I]t is apparent that in the context of this statute the words "ground" and "reason" have different meanings.' [Citation.]  The word 'ground' refers to any of the seven grounds listed in section 657. [Citation.] A statement of grounds that reasonably approximates the statutory language is sufficient. [Citations.]  The statement of 'reasons,' on the other hand, should be specific enough to facilitate appellate review and avoid any need for the appellate court to rely on inference or speculation."  (*Oakland Raiders,* at p. 634.)  "The statement of reasons must refer to evidence, not ultimate facts." (*Id.* at p. 635.)  As the California Supreme Court has recognized, this strict interpretation of section 657 "has been

_____

[2]     All further undesignated statutory references are to the Code of Civil Procedure unless otherwise indicated.

11

criticized as creating 'a "procedural minefield" for trial judges who issue new trial orders.' " (*Oakland Raiders*, at p. 635.)

In granting a new trial, the court must find prejudice as well. (*Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 147 ["To be entitled to a new trial, the moving party must also show the error was prejudicial—that it affected a substantial right and prevented him from obtaining a fair trial"].)

"When the trial court provides a statement of reasons as required by section 657, the appropriate standard of judicial review is one that defers to the trial court's resolution of conflicts in the evidence and inquires only whether the court's decision was an abuse of discretion." (*Oakland Raiders, supra,* 41 Cal.4th at p. 636.) "[T]he absence of a statement of reasons calls for independent review of the trial court's order granting a motion for a new trial. . . . The reviewing court should not . . . defer to the trial court's resolution of conflicts in the evidence, or draw all inferences favorably to the trial court's decision, because in the absence of a statement of reasons, the record does not show whether the trial court resolved those conflicts or drew those inferences." (*Id*. at p. 640; see *Montoya v. Barragan* (2013) 220 Cal.App.4th 1215, 1228 (*Montoya*) ["Where the statement of reasons is inadequate, we independently review the trial court's order granting a new trial"].) In this context, independent review simply means that we do not defer to the trial court's resolution of conflicts in the evidence or draw inferences favorable to the trial court's decision. (*Oakland Raiders*, at p. 640, fn. 4.) These shifting standards of review can be viewed as creating a procedural minefield for the appellate courts who review new trial orders.

Here, the new trial order contains a statement of reasons, which lists three reasons under the general heading "Expert Evidence," but lacks an express specification of the statutory grounds which support those reasons. For one of the reasons, it is unclear upon which statutory ground the court relies.[3] The statement of reasons itself is lacking specificity on certain key issues we discuss in more detail below. One recurrent issue is when and to what Terminix objected; a second recurrent issue is whether prejudice flowed from any error.

A.    *Dr. Brautbar's Testimony About the Gobba Study Does Not Provide a Reason to Affirm the New Trial Order*

The trial court gave this first reason in support of a new trial: "The court should have sustained the defense objection to Brautbar's testimony regarding the Gobba case, once the full extent of the case became apparent. This was the only study cited by the expert that concerned a loss of smell and taste after exposure to chemicals used to eradicate German cockroaches. The required nexus between the Gobba incident and this case lacked scientific rigor. In Gobba, the mix of chemicals were unknown. The concentration of the chemicals was also unknown. The subject of the case study sat in a closed room for several days, 6 hours at a time. In the instant case, the mixture of

_____

[3]    Appellant and Terminix agree that the first and third reasons provided by the trial court support the statutory ground of error in law, specifically the erroneous admission of expert testimony. Terminix contends the second reason supports the statutory ground of irregularity in the proceedings, specifically attorney misconduct. Terminix does not contend the trial court based the new trial order on any other statutory ground, such as insufficiency of the evidence.

chemicals and aerosolized components, as well as their concentration, is also unknown. This one incident stood alone in the scientific literature. There were no rigorous clinical studies or peer-reviewed scientific inquiries. A single incident does not support its use in a jury trial. Yet, its impact may have been significant."

Both parties agree the trial court was likely referring to the statutory ground of error in law. We agree this is the most likely ground.

As a fundamental matter, a new trial on the ground of legal error may be granted only if the moving party objected to the allegedly erroneous ruling. (Code Civ. Proc., § 657, subd. (7) ["Error in law, occurring at the trial and excepted to by the party making the application"]; see Evid. Code, § 353, subd. (a) [verdict shall not be set aside or judgment reversed unless "(a) [t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"].)

Appellant contends the trial court was mistaken in finding that Terminix made timely and specific objections to Dr. Brautbar's testimony. We agree.

The trial court's statement of reasons refers to "the defense objections" but gives no indication of when such objections occurred or what those objections were. Even Terminix itself cannot pinpoint the objections to which the court refers. Instead, it offers a variety of possibilities, from its pretrial written motion in limine 23 (MIL 23) to arguments made during the hearing on a related motion in limine to general foundational objections during Dr. Brautbar's videotaped combined Evidence Code section 402 hearing and trial testimony. While this might sound

14

like an abundance of riches, when the record is examined, it is not.

Complicating our analysis is the suggestion in the statement of reasons that the trial court did not become aware of the information which justified exclusion until after it denied the objections, that is, "once the full extent of the case became apparent." However, when events at trial change the context in which evidence is offered, "a renewed objection is necessary to satisfy the language and purpose of Evidence Code section 353." (*People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824; *Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1184.)[4]

The trial court's statement about defense objections is not specific enough to facilitate appellate review. We cannot defer to the trial court's vague and conclusory finding that Terminix objected on some unspecified ground at some unspecified time, possibly before sufficient facts were known to warrant sustaining the motion and excluding the evidence. We independently review the issue of whether the requirement of a timely and specific objection was met. We determine it was not.

1.    The Motion in Limine (MIL 23)

In MIL 23, Terminix sought, on several grounds, to preclude Dr. Brautbar's opinion testimony on the effects of a

---

[4]    The trial court does not specify when it became aware of the full extent of the Gobba case, but it seems likely that this occurred during the testimony of Terminix's expert Dr. Fedoruk. Terminix has not identified a renewed objection to the Gobba study, a motion to strike the study, or any similar action taken at that time.

number of pesticides.  For one of the pesticides, pyrethrins, Dr. Brautbar had relied in part on the Gobba study, although it was not mentioned by name.  Terminix contends the trial court denied this motion in limine and so it had no further duty to object. (See, e.g., *Pinter-Brown v. Regents of University of California* (2020) 48 Cal.App.5th 55, 94.)

The record does not support an inference that the trial court order was referring to MIL 23 as Terminix's operative objection to the Gobba report evidence.  The trial court states it "should have sustained the defense objections to Brautbar's testimony regarding the Gobba case, *once the full extent of the case became apparent.*"  The trial court then sets forth the "full extent" of the case: "This was the only study cited by the expert that concerned a loss of smell and taste after exposure to chemicals used to eradicate German cockroaches.  The required nexus between the Gobba incident and this case lacked scientific rigor.  In Gobba, the mix of chemicals were unknown. The concentration of the chemicals was also unknown.  The subject of the case study sat in a closed room for several days, 6 hours at a time."

Almost none of this information is found in MIL 23. Terminix described the study, which was not identified by name, by reference to excerpts from Dr. Brautbar's deposition as follows: "The only study Dr. Brautbar referenced that involved total loss of smell involved exposure to a product containing different chemicals than those Terminix used. [Citation.]  This was not an epidemiological study. [Citation.]  The individual in the study was exposed for six hours per day for 'a few days.' [Citation.]"  There is no mention in MIL 23 or the cited deposition pages of German cockroaches, chemical concentrations, or a

"closed" room.  If the mixture of chemicals in the Gobba study was unknown, as the trial court stated in its order, this was not apparent from MIL 23 or the cited deposition pages.  There is no discussion of the length of "exposure" at the cited pages; Dr. Brautbar simply states that the patient left, then returned to work in the room.  Nor were additional details about the Gobba study provided at oral argument on MIL 23.[5]  Although

<hr />

[5]     Although not determinative of our ruling, we note that in discussing MIL 23 in this appeal, Terminix provides different and broader cites to Dr. Brautbar's deposition, implicitly acknowledging that the cites in the MIL 23 were not accurate or sufficient.  Of course, it was not the trial court's task to search the deposition for information to support Terminix's claims about the study. (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 156 [If a party does not support an argument with the necessary citations to the record the argument is deemed forfeited].)

Terminix's appellate counsel stated at oral argument that the study was attached to Dr. Brautbar's deposition, which was lodged with the trial court.  The deposition was lodged with the court at the beginning of the oral argument on MIL 23, and then only after the court expressed its frustration that only excerpts from the deposition were attached to the MIL 23.  While the Gobba study was marked as an exhibit at Dr. Brautbar's deposition, the copy of that deposition provided by Terminix in its Respondent's Appendix does not include the exhibits, and Terminix has not provided any record citations showing the deposition exhibits were lodged with the court.  More importantly, there is nothing in the text of MIL 23 to indicate that excerpts from the study, or the study itself, were attached to MIL 23, and there are no cites to the study in MIL 23.  It would not, in any event, have been the trial court's task to search the study for information to support Terminix's claims.

Terminix's appellate counsel mentioned to us at oral argument that oral argument on MIL 23 in the trial court was extensive, counsel failed to add that the Gobba study was mentioned only once, in passing, and then by appellant's counsel.

Given the above gaps and deficiencies in MIL 23, the trial court could only have learned the "full extent" of the Gobba study *after* the hearing on MIL 23. Whenever this additional evidence described by the court was offered, Terminix would have had to renew its objection. (*Summers v. A.L. Gilbert Co.*, *supra*, 69 Cal.App.4th at p. 1184 ["if the evidence presented during trial is substantially different from that presented at the hearing on the motion *in limine* or included in an offer of proof, it is incumbent on the party who made the motion to renew the objection to the evidence"], original italics.)

Perhaps more importantly, the trial court did not unequivocally deny MIL 23 as to pyrethrins. The court's ruling was, at best, tentative and unclear. Although the trial court initially stated it was denying the motion, after a request for clarification from Terminix's counsel, the trial court stated: "I have no problems with regard to the Alpine Dust (diatomaceous earth) and the Cy-Kick." The court added: "The top items, the 221L, 565 Plus, and Temprid SC, I'll think about. [¶] If there is anything you want me to look at with regard to any of the further deposition material or other material, let me know and I'll consider that." The next morning, during the second day of hearings, the court repeated: "With regard to the 23rd MIL by defense, the issue of three items of application were still undecided. They were taken under submission. The 221L aerosol, the 565 Plus XLO Formula II and the Temprid SC. I'd

like a 402 hearing on that, actually, with the doctor. We can do it just before he testifies."

### 2. Terminix's Reference to the MIL 23 During the Later Hearing on a Related Motion in Limine

Terminix contends that the Evidence Code section 402 hearing was only meant to encompass the limited issue of whether appellant was exposed to those three chemicals, and thus was a firm denial of the medical causation portion of MIL 23 involving the Gobba study. We do not agree,[6] but even assuming for the sake of argument that it was a denial, the court soon changed its mind, at Terminix's request.

---

[6] After the court ordered the Evidence Code section 402 hearing, Terminix's counsel asked: "[T]he 402 of Dr. Brautbar that the court is suggesting take place, would be solely with regard to those three chemicals or products?" The court replied: "Correct." Terminix's counsel asked: "And it would be otherwise limited, and the court is overruling or denying my request for a more expansive 402 on the other products; is that correct?" The court: "That is correct." We see only a limitation by product type, but no limitation on what could be raised concerning those products.

We note that at oral argument, Terminix's appellate counsel took a different position, contending that the trial court's expressed concern about scarring during the argument on MIL 23 showed that the Evidence Code section 402 hearing was the objection to the Gobba study. We understand the exchange at page 649 forward to involve the issue of whether any medical tests, such as a biopsy, could show the scarring in appellant's nose. We agree, however, that one of the purposes of the section 402 hearing was to explore the admissibility of Dr. Brautbar's testimony, including his reliance on the Gobba study.

As Terminix acknowledges, during the second day of hearings and after the ruling set out above, Terminix raised the issue of the Gobba case study, among others. Terminix's counsel discussed a number of articles on diatomaceous earth and then mentioned a study on pyrethrins as being "a case report of one individual in Italy some time ago, and it was a case report, and it was a hypothesis generating proposition as opposed to something that could be used as a means for establishing a basis for causation." This was the Gobba study. The trial court asked: "So what are you asking?" Counsel replied: "What I'm asking is that when Dr. Brautbar's opinions are being put forward to this court that the court actually take a look at those studies to determine whether they are at the proper basis of an opinion. . . . [¶] [W]hen Dr. Brautbar is on the stand, he needs to explain why these literature sources that he relies upon can be the proper basis of an opinion . . . . This is [a] heads-up to the court that a more [intellectual] analysis for the basis of Dr. Brautbar's testimony needs to be done by both counsel and this court before he expresses an opinion." The court replied: "It is not unusual to ask for the opinion first, and then ask what is the basis of the opinion . . . . I assume at some point you'll interject an objection." Terminix's counsel replied: "Absolutely." The court asked: "And what will then happen; I'm going to have a lengthy 402 hearing?" Terminix's counsel replied: "Most likely."

Even without this statement from the court that it expected Terminix to raise objections to the studies at the hearing, Terminix was required to do so. (See *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 452 ["When a court has not finally ruled on an in limine motion . . . Evidence Code section 353 requires a timely

objection during presentation of the evidence" to preserve the issue].)

3. Objections During the Combined Evidence Code Section 402 Hearing and Trial Testimony

Terminix claims that during the combined Evidence Code section 402 hearing and testimony, it did object to Dr. Brautbar's causation testimony on the ground that it lacked foundation. Pages cited by Terminix is to a question which directly asked about the Gobba case study report.

Terminix makes no effort to explain how the objections cited would have alerted the court and opposing counsel that it was objecting specifically to the Gobba study. The objections were simply broad "placeholder" objections, which are not sufficient to preserve the claim. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 22 [party cannot rely on a "placeholder" objection stating general grounds]; *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 564 [objection that expert testimony was "speculative" was not sufficient to preserve claim that expert used a legally impermissible methodology].) At oral argument, Terminix's appellate counsel claimed that speaking objections were not allowed. Terminix did not make this claim in its respondent's brief, and it is inconsistent with the exchange between Terminix's trial counsel and the court concerning the way the Evidence Code section 402 hearing would unfold, as set forth above.[7]

---

[7] Further, the combined Evidence Code section 402 hearing and trial testimony of Dr. Brautbar was videotaped, with the understanding that it would be edited before being played to the jury, so even assuming speaking objections were not permitted in front of the jury, they could be edited out of the video.

This vagueness is exacerbated by the fact that Terminix's claims of foundational deficiencies in Dr. Brautbar's causation testimony were not limited to the Gobba study alone, or even to pyrethrins. In fact, many of the foundational objections Terminix cites are to questions about chemicals other than pyrethrins.[8] We see no connection between these objections and the Gobba study.

Only three of the 11 cited foundational objections are even remotely related to the Gobba study, but these objections are not sufficient. On cited page 39, appellant's counsel asks whether toxicological studies reviewed by Dr. Brautbar supported his reliance on case studies. Terminix objected on lack of foundation, but it is not clear what foundation Terminix believed was lacking. Although the objection was overruled, Dr. Brautbar then provided one type of foundation, testifying that in his field, it was common to rely on case studies which are supported by toxicological studies. Appellant's counsel then asked: "This is one of the circumstances where you can rely on the case report?" Terminix did not object, indicating Brautbar's answer had supplied the missing foundation.

On cited page 40, Terminix objected to the question "What is your understanding of the risks presented by pyrethrins?" Pyrethrins were applied by Terminix and were also involved in

_____

[8] The objectionable questions involve diatomaceous earth. Others involve piperonyl butoxide. Other objectionable questions involve pyrethroids, which are related to pyrethrins, but not exactly the same. In context, both of those questions and follow-ups demonstrated Dr. Brautbar was relying on a variety of materials and his own research and experience as the basis for his answer. Much more specificity was required to establish that the objections were directed to the Gobba study.

the Gobba study, but this question did not call for any reliance on the Gobba study. Dr. Brautbar answered, "The risks of acute exposure is that of irritation of the eyes, skin, oral lining, or mucosa as we call it, and nasal mucosa. In general, that's the main ones."

On cited page 44, Terminix's foundational objection was to a question asking whether the presence of butoxyethanol and pyrethrin were "synergistic." This objection was sustained. While butoxyethanol is a chemical involved in the Gobba study, the question does not in any way suggest or require reliance on that study. It simply asked about the interaction between two chemicals when combined. Further, after the objection was sustained, appellant asked Dr. Brautbar to explain his understanding of the interaction between the two chemicals, based on his "training and experience, research on these chemicals." Terminix did not renew its foundational objection. Dr. Brautbar testified without objection that the effect was additive (rather than synergistic).

Finally, we note that the combined Evidence Code section 402 hearing and testimony unfolded as the trial court had anticipated, but Terminix did not object as suggested by the trial court. When appellant's counsel sought to elicit Dr. Brautbar's opinion on the risks of a "family of chemicals," Terminix objected on the ground of lack of foundation. Appellant then began the lengthy process of eliciting from Dr. Brautbar the basis of his opinion that pyrethroids and pyrethrins posed a risk of loss of smell. Eventually, appellant asked Dr. Brautbar if he had found in his research "case studies regarding potential consequences from exposure to pyrethrins?" Terminix did not object. Appellant replied, "yes." Appellant then asked, "What did you discover?"

Terminix did not object.  Dr. Brautbar replied: "I found, I believe, two or three case reports, where patients were exposed to pyrethrin have developed lesion and loss of smell."  This was a very clear reference to the Gobba study.  This was precisely the situation where the trial court had previously indicated Terminix could object and be heard further, that is, when Dr. Brautbar was testifying about the bases for his opinions.  Terminix did not do so.

At oral argument, Terminix's appellate counsel contended that the objections actually occurred during its cross-examination of Dr. Brautbar, because those questions laid out problems with the Gobba study.  Again, this is not a claim made in its respondent's brief.  We note, however, that questions are not themselves evidence and Dr. Brautbar did not agree that there were problems which precluded reliance on the case study.  At a minimum, Terminix needed legal authorities or testimony from other experts explaining why Dr. Brautbar's answers warranted exclusion of the study, or more precisely his testimony based on the study.  With such additional information, Terminix would then have to renew its objection to Dr. Brautbar's testimony about the Gobba study.  Terminix has not provided any record citations showing that that occurred.

Because Terminix did not specifically object to the Gobba study, the trial court's admission of the study is not an error in law within the meaning of the new trial statute and cannot support the new trial order.

B.    *References to Dr. Berman's Treatment of a Patient Do Not*
       *Provide a Basis to Affirm the New Trial Order*

The trial court provided a second reason warranting a new trial: "[P]laintiff's ENT, Dr. Berman, related information

24

concerning a patient who lost the sense of smell and taste after exposure to insecticide spray used for eradicating German cockroaches. This court had ruled that the incident could only be used in terms of the doctor's listed experience. Plaintiff's case included two references to [Dr.] Berman's treatment of a patient with 'this exact problem' and 'these exact conditions from this exact exposure.' There was nothing exact about any [of] this information. While normally this would not mean much in a case involving cancer such as mesothelioma, where the scientific literature is robust and well documented, its improper influence and weight in a case where no other scientific studies are cited ought not to be understated."

As was the case with all its reasons, the trial court did not specify the statutory ground which the reason supported. Here, the parties do not agree which ground the trial court intended. Appellant contends the trial court is discussing what it believes to be the erroneous admission of expert testimony, and thus the ground must be an error in law. We are inclined to agree. The discussion is placed under the heading "Expert Evidence," and is sandwiched between the discussion of Dr. Brautbar's testimony about the Gobba study and Dr. Berman's testimony about diatomaceous earth, both of which involve evidence, not arguments. The court states there is nothing "exact about any of this information," which suggests the problem is evidentiary. This is reinforced by the trial court's analysis of the effect of the error, which discusses only the weight (or lack thereof) of the evidence on medical causation, an analysis which is consistent with the erroneous admission of evidence.

25

Error in law, however, requires an objection, which Terminix did not make.  Thus, it cannot be a valid ground for the new trial order.

Terminix points out the two phrases quoted by the court in its new trial order were part of appellant's closing argument. It contends the court was therefore discussing attorney misconduct and relying on the ground of irregularity in the proceedings.[9]  Terminix does not explain why the trial court

_____

[9]     Terminix cites old but apparently still valid law by the California Supreme Court that an objection is not required for the ground of irregularity in the proceeding.  (*Malkasian v. Irwin* (1964) 61 Cal.2d 738, 747 (*Malkasian*).)  This results in the odd situation that a party who fails to object to attorney misconduct may not raise the claim directly as a ground for reversal on appeal but may raise it as a ground for a new trial and may claim on appeal that the attorney misconduct warranted the granting of the new trial motion.

We note appellant cites recent authority which relies on an old Supreme Court case holding that "irregularity in the proceedings" refers to "any act that (1) violates the right of a party to a fair trial and (2) which a party 'cannot fully present by exceptions taken during the progress of the trial, and which must therefore appear by affidavits.'  (*Gay v. Torrance* (1904) 145 Cal. 144, 149, [78 P. 540], [citation].)"  (*Montoya, supra,* 220 Cal.App.4th at pp. 1229–1230.)  While *Gay* does not appear to have been expressly overruled, the California Supreme Court has twice expressly found attorney misconduct to be an irregularity in the proceeding when the ground could have been presented during trial.  That was the situation in *Malkasian,* which involved counsel who argued facts not in the record. (*Malkasian, supra,* 61 Cal.2d at p. 745.)  In 1977, the Court stated "[i]t is well settled that misconduct of counsel is such an irregularity and a ground for new trial. [Citations.]  It is also

would have placed its discussion of these statements under the heading "Expert Evidence," or why it would do so without making it clear that it was referring to attorney misconduct and irregularity in the proceedings.  Terminix also does not explain why the trial court failed to consider factors normally used to assess prejudice from attorney misconduct during argument, such as how the jury was likely to have understood the remarks and the ameliorative effect, if any, of the jury instructions.

In its motion for a new trial, Terminix did raise these two phrases as attorney misconduct constituting irregularity in the proceedings.  This does not shed any light on the trial court's selection of grounds, as Terminix also complained about these statements in a section entitled "Expert Testimony Should Have Been Excluded."  Nevertheless, because Terminix raised irregularity in the proceedings in its motion, we can consider this ground.  Because the trial court did not "effectively state" the ground of irregularity in the proceedings in its order, Terminix has the burden to "advance any grounds stated in the motion upon which the order should be affirmed, and a record and argument to support it."  (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 905–906; *Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1127.)

However, Terminix is vague about what, exactly, was attorney misconduct.  Like the trial court, Terminix refers to the

_____

well settled that misconduct has often taken the form of improper argument to the jury, such as by urging facts not justified by the record or suggesting that the jury may resort to speculation."  (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870.)  There is generally no need for affidavits to present such a claim of misconduct.

limiting order. Both of the phrases quoted, however, were used, as allowed, to describe Dr. Berman in terms of his expertise which would be in compliance with the trial court's previous order. The first quote is part of an explanation of counsel's referral of appellant to doctors: The attorney "said, 'Listen, there's some great doctors.' Dr. Berman, who's [an] ear, nose, and throat specialist, who's actually treated patients with this exact problem, toxic exposure." The second quote refers to Dr. Berman, "who [has] treated patients with these exact conditions from this exact exposure."

This leaves "arguing facts not in evidence" as the only possible misconduct. (There was no evidence of the precise chemicals to which the prior patient was exposed.) Terminix does not offer any argument that the first phrase, "a patient with this exact problem, toxic exposure" is improper. Accordingly, we do not consider it as a basis for attorney misconduct.

Terminix argues that the phrase "from this exact exposure" must have been intended to mean and been understood by the jury as meaning that Dr. Berman's patient was exposed to the exact same chemicals as appellant. Terminix, however, makes no attempt to analyze the phrase in context. We find it far from obvious what counsel intended to convey by this phrase or how the jury would have understood it. (See *People v. Rivera* (2019) 7 Cal.5th 306, 334 [when misconduct claim is based on comments before the jury, " ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion" ' "].)

The phrase was used by appellant's counsel when arguing that Terminix had failed to provide an alternative explanation for appellant's loss of smell and taste. Counsel argued: "We know he

28

doesn't have a brain tumor. We know he doesn't have cancer and had the end organ and the nerves fried. They gave you no other reason except for Brautbar and Berman, who have treated patients with these exact conditions from this exact exposure." It appears counsel, at least in part, misspoke, since it makes no sense to say that Terminix provided Dr. Brautbar and Dr. Berman as an alternate explanation. Terminix does not explain why this garbled statement should be understood as an attempt to mislead the jury, or why the jury would have given it any weight at all.

Even assuming the jury keyed in on the last part of the sentence, Terminix does not explain why the jury would understand the phrase "this exact exposure" to refer to specific chemicals. Counsel did not mention any chemicals by name. Earlier in the argument, counsel had stated that the patients suffered this "exact problem, toxic exposure." We see no reason the jury would ascribe a different meaning to the second use of the word "exposure" in the same argument, particularly since both usages were in connection treatment of patients; "toxic exposure" does not imply particular chemicals were involved. We note Terminix did not object to this argument, although it had previously objected eight times that counsel's remarks were "beyond the evidence" or that there was "no evidence of that." This lack of objection certainly suggests Terminix itself did not understand the statement as problematic when it was made.

Finally, even if appellant's counsel did incorrectly state that Dr. Berman had treated a patient with the exposure to the exact same chemicals as appellant, Terminix has not shown prejudice from such a statement. Terminix relies on the trial court's remarks that "its improper influence and weight . . . ought

29

not be understated." This is not a clear finding of prejudice, but even if it were, it would not be sufficient. The weakness of a party's evidence can be a factor in assessing prejudice from attorney misconduct but, as we mention above, more must be considered. Terminix has not filled this gap.

We find counsel's remark to be brief and isolated: it was one sentence in an argument which lasted almost two hours. It was also somewhat oblique and indirect, as we have discussed above. These facts weigh against a finding of prejudice. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 802–803 (*Cassim*).)

We also consider "the ameliorating effect of the trial court's instructions to the jury to guide its decisionmaking. Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed.' " (*Cassim, supra,* 33 Cal.4th at pp. 803–804; see also *People v. Hinton* (2006) 37 Cal.4th 839, 863 [trial court's instructions before opening statement and again before closing argument that the attorneys' statements were not evidence would have dispelled any prejudice].)

Here, the jury was well aware that argument of counsel was not evidence. The jury was specifically instructed that "What the parties say in closing argument is not evidence," and twice instructed "You must decide what the facts are in this case only from the evidence you see or hear during the trial. Sworn testimony, documents, or anything else may be admitted into evidence. . . . [¶] . . . In their opening statements and closing arguments, the attorneys will talk to you about the law and the evidence[,] but their statements and arguments are not evidence." At the close of the evidence, the jury was instructed:

"You must decide what the facts are. . . . You must decide the facts based on the evidence admitted in this trial." Moreover, shortly before the statement at issue, in response to Terminix's objections, the trial court twice reminded the jury during appellant's closing argument: "You are the ones who determine what the facts were in this case, all 12 of you deliberating. And again, if you want it to be read back to you, you may have the testimony read back to you." "Again, ladies and gentlemen, you are the ones who determine what the facts are in this case." Terminix has not offered any argument or evidence to overcome the presumption the jury followed those pervasive instructions.

We conclude Terminix has not shown the argument resulted in a miscarriage of justice, because it is not reasonably probable Terminix would have received a more favorable outcome in the absence of counsel's remark during closing argument, and so that remark cannot be the basis of a new trial order. (*Cassim, supra*, 33 Cal.4th at pp. 801–802 [applying *Watson* standard to closing argument].)

C.    *Dr. Berman's Testimony That Diatomaceous Earth "Beat Up" Appellant's Nasal Mucosa Does Not Provide a Basis to Affirm the New Trial Order*

The trial court gave a third reason to justify a new trial: "Berman testified that diatomaceous earth, a major component of Alpine Dust, is used to kill cockroaches because it 'actually rip[s] the exoskeleton of cockroaches. Cockroaches don't have bones like we do. Their bones are basically on the outside of their body, and if you can break that down, you can have chemicals enter that will kill them.' [Citation.] Berman was also asked to describe diatomaceous earth. He stated, in part, '[i]f you look under an electron microscope, it looks like you're walking on

razor blades[.] It's like a poison dagger.' [Citation.] Berman testified that this happened to the mucosa in plaintiff's nose. During this testimony, the defense objected. The difficulty is there was no scientific information brought to bear as to the effect on parts of the human body of these 'razor blades' that are only visible through an electron microscope. Furthermore, to determine the effect on the human body of a substance based on its effects on insects, is a connection that remained unsupported by any scientific evidence. The inflammatory nature of the colorful language concerning razor blades and poison daggers only compounds the error."

Again, the trial court failed to specify a statutory ground. The parties agree the most likely ground is error in law. We agree as well. We have some difficulty identifying that error, however, in part because the trial court is again unclear about when and to what the defense objected. The trial court quotes two passages of testimony, states Dr. Berman testified that this is what happened to appellant's nasal mucosa, and then notes broadly that the defense objected. The record is clear Terminix did not in fact object to the quoted testimony that Alpine Dust ripped the exoskeleton of insects or that diatomaceous earth looked like razor blades. Nor did it move to strike that language, which the court bemoans as "inflammatory." Thus, the court's error cannot be in overruling an objection to this "colorful" language, because no such objection was made. Although not determinative of our ruling, we note that the description of diatomaceous earth as looking like razor blades or shards of glass was used elsewhere in the trial without objection.

Terminix objected only when appellant's counsel asked: "So the diatomaceous earth and the pyrethroids and pyrethrins that

you mentioned are irritants, how did that affect his loss of sense and smell?" Its objection was: "Foundation. 801. 802." This objection was overruled and Dr. Berman then testified "[s]o you get in there, and you *beat up* the protective exoskeleton, and you put a poison in it, and the dust can have a poison on it as well, so it's like a poison dagger." (Italics added.) Terminix's counsel did not move to strike the poison dagger reference. As this full quote shows, the poison dagger phrase was not part of the description of diatomaceous earth under a microscope as the ellipses in the court's quotation in its order might suggest.

If the trial court believes the admission of Dr. Berman testimony that diatomaceous earth can damage nasal mucosa and cause a loss of smell and taste was error because there was no scientific information or scientific evidence to show its effect on the human body, the trial court is simply incorrect. Although his testimony had not yet been played for the jury, Dr. Brautbar had already testified during his February 26 videotaped examination that diatomaceous earth causes "irritation of the mucosa, which in some patients destroys the mucosa and causes scarring of the mucosa." Appellant's counsel asked: "Are you talking about like scarring if I were to cut myself or something else?" Dr. Brautbar replied: "It's similar, but a scar is a scar."[10] The trial court has not identified the admission of this testimony as erroneous. We note, as the trial court does not, that Dr. Berman did not testify that diatomaceous earth "ripped" or "cut" the mucosa, but simply that it "beat up" the mucosa. This is consistent with Dr. Brautbar's testimony that diatomaceous

[10]    Terminix contends Dr. Berman did not cite Dr. Brautbar's testimony as the basis for his opinion. Terminix has waived this claim by failing to provide a record cite to support it.

33

earth irritated mucosa enough to inflame it and cause scarring. Put differently, the trial court did not abuse its discretion in permitting Dr. Berman to testify that diatomaceous earth, together with other chemicals, damaged appellant's nasal mucosa and caused his loss of smell. There was no error in law.

In addition, the trial court did not make any specific finding of prejudice at all about the challenged testimony. In the next paragraph, the court remarks generally that "Considering the weight usually given to experts and medical doctors, the errors that permitted the jury to hear this improper evidence may not be ignored." This too is not a finding of prejudice. There is no rule that presumes prejudice from the erroneous admission of expert testimony. Terminix identifies prejudice based on the "colorful" language used by Dr. Berman, but as we have just explained, the use of this language does not constitute an error in law. Thus, the lack of any identifiable prejudice also precludes using this reason as justification for a new trial.

D. *The Instruction on Suppression of Evidence Was Properly Given and So Does Not Provide a Basis to Affirm the New Trial Order*

Terminix contends that even if none of the three stated reasons is sufficient to uphold the new trial order, the order must be upheld because the trial court erred in instructing the jury on the suppression of evidence.

Terminix did identify this ground in its motion for a new trial. But Terminix shoulders the burden of showing that the order should be affirmed on this ground. We are not persuaded.

The trial court instructed the jury pursuant to CACI No. 204 that "You may consider whether one party intentionally concealed or destroyed evidence. If you decide that a party did

34

so, you may decide that the evidence would have been unfavorable to that party."

The trial court discussed its reasons for giving the instruction in the new trial/JNOV order. The court focused on Ortiz's incomplete report and subsequent "loss" of the report by Terminix and Terminix's decision to send a cleaning crew to Beauty.

Terminix focuses its argument on this order. It contends there is no evidence of willful suppression of Ortiz's work order because there is no evidence Ortiz failed to complete the report and Kaiser failed to require Ortiz to correct it *with the intention of preventing it from being used in litigation.* (*New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1434.)

We review the entire record to determine if there is substantial evidence to support the instruction. (*Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 992.) We view the evidence in the light most favorable to the contention that the instruction is applicable. (*Freeze v. Lost Isle Partners* (2002) 96 Cal.App.4th 45, 53.) A judgment may not be reversed on appeal for an error involving misdirection of the jury, unless after an examination of the entire cause, including the evidence it appears the error caused a miscarriage of justice. When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability of a more favorable outcome in the absence of the error. (*Soule v. General Motor Corp.* (1994) 8 Cal.4th 548, 574.)

While Terminix is correct that neither man knew appellant had been injured by the pesticides, both men knew Cohanim was very unhappy about the pesticide entering his business. Ortiz testified Cohanim was really upset and mad. Ortiz was worried

35

because the man was yelling, something he did not normally encounter. He called his service manager and Kaiser to discuss the situation. The next morning, Kaiser learned Terminix's call center had received a complaint from Cohanim. It is reasonable to infer the men decided to conceal evidence of the exact amount of applied pesticides and the location where they were applied to hamper any litigation brought by Cohanim. (See, e.g., *Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1009 ["As with other mental states, plaintiffs may rely on circumstantial evidence to prove the intent" and the specific intent " 'with which an act is done may be shown by the circumstances surrounding the commission of the act' "].)

Terminix also complains of the trial court's reference to the report being "lost," because appellant was able to obtain a copy of report from the Department of Health. Terminix misses the point twice. Terminix's act of losing the report was an act of concealment by Terminix. The fact that appellant found a copy in a location which Terminix did not control does not alter Terminix's concealment of the copy it did control. More importantly, for purposes of negative inferences, the concealed and/or suppressed evidence was the information missing from the report.

Terminix next contends the cleaning team's actions were not suppression of evidence by Terminix because there was no evidence Terminix sent the team. Even if this were true, it would not make the instruction improper, because, as we have explained, there was other evidence permitting the inference of concealment and suppression in connection with the preparation and retention of Ortiz's report. No specific acts were listed in the

36

instruction, and only one incident is required to warrant giving the instruction.

Nevertheless, we note there is sufficient evidence to support a reasonable inference that Terminix sent the cleaning crew. Cohanim testified that a man in a Terminix uniform came to Beauty, saw the residue in the bathroom and "said they are going to send someone to come and clean it up." Cohanim testified the cleaning people were not wearing Starbucks clothing. Further, Terminix offers no explanation as to why Starbucks would pay a cleaning crew to clean up Terminix's mess. Someone paid for the cleaning crew, and the most reasonable inference is that it was Terminix. Although not determinative of our decision, we note that Cohanim's testimony on redirect, while not entirely clear, can be understood as saying that the cleaning crew arrived while Kaiser was there, and that one of them was wearing a Terminix badge.

## CROSS-APPEAL OF DENIAL OF JNOV MOTION

Terminix cross-appeals the trial court's denial of its motion for JNOV. Terminix contends the trial court erred in denying the motion because appellant did not present substantial evidence of 1) actual exposure; 2) the composition of the "smoke"; or 3) medical causation. We disagree.

"The trial court's power to grant a motion for judgment notwithstanding the verdict is the same as its power to grant a directed verdict. (Code Civ. Proc., § 629.) 'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citations.] On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether

37

there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict.  [Citations.]  If there is, we must affirm the denial of the motion.  [Citation.]  If the appeal challenging the denial of the motion for judgment notwithstanding the verdict raises purely legal questions, however, our review is de novo." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.)

In reviewing the record for substantial evidence, we view the evidence in the light most favorable to the verdict, resolve any conflict in the evidence in favor of the verdict and draw all reasonable inferences in favor of the verdict. (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192; *Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 313–314.)

A.      *There Is Substantial Evidence That Appellant Was Exposed to "Smoke" Containing Pesticide Applied by Terminix*

Terminix contends that without concrete evidence of some flaw or opening or gap in the bathroom wall, it is simply speculation that the pesticides it applied to Starbucks travelled through the wall and into Beauty's bathroom.

We begin with the obvious point.  There is more than substantial evidence that a cloud of something that looked like smoke *did* get into the bathroom.  Both appellant and Cohanim testified on this point.  There is ample corroborating evidence of the existence of the "smoke."  Kaiser acknowledged that Terminix's call center received a complaint about "smoke" from the owner of Beauty, which was passed on to him the next morning.  Ortiz testified Cohanim banged on the door of Starbucks as Ortiz was completing his work assignment, and insisted he come into Beauty and view the bathroom.

38

This "smoke" appeared in the bathroom at almost exactly the time Ortiz was applying Alpine Dust to the cavity in the wall shared by Beauty and Starbucks. Cohanim testified that in the past, he could smell roasting coffee from Starbucks, which supports an inference that air could pass between the two businesses. The ventilation fan in the bathroom pulled air out of the bathroom, and turned on with the light, and so may have been on when appellant entered the bathroom and saw the smoke. The most reasonable, if not only, inference from these circumstances is that the smoke was entering the bathroom through openings in the wall which Kaiser failed to see or recognize.

In its reply brief, Terminix contends for the first time that the "smoke" could not be Alpine Dust because the smoke was dark and Alpine Dust is white; there was no evidence that the dark color was caused by Alpine Dust combining with other chemicals; and Ortiz's application did not take place at the same time as appellant saw the smoke.

Generally, we do not discuss claims raised for the first time in a reply brief. " ' " 'Obvious considerations of fairness in argument demand that the appellant present all of his [or her] points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his [or her] opportunity to answer it or require the effort and delay of an additional brief by permission. Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.' " ' " (*High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 111, fn. 2 (*High Sierra*).)

Terminix's argument in its opening brief was a purely mechanical one, that is, the "smoke" could not have come from its application of pesticides in Starbucks because there was no direct evidence of a hole or gap in the wall. We decline to consider Terminix's new and unrelated arguments in its reply brief that whatever entered the bathroom could not have been Alpine Dust or other pesticides due to the color and odor of the smoke and the nature and application location of pesticides other than Alpine Dust.[11]

We do consider Terminix's discussion of the timing of the smoke as it is important part of the trial court's ruling as well as our own. Terminix contends Ortiz testified 15 minutes elapsed after he completed the Alpine Dust application and before there was a knock on Starbucks's door, and so the application was not simultaneous with the appearance of the smoke.

Ortiz testified the elapsed time was "about 10 to 15—about 15 minutes." Viewing the evidence in the light most favorable to the verdict, by the time Ortiz became aware of Cohanim banging on Starbucks, 10 minutes could easily have passed since Ortiz completed his application, making his application almost simultaneous with the appearance of the smoke. The timeline is as follows: Appellant was in the bathroom for about three to four minutes after he became aware of the smoke. Then, appellant left the bathroom and called out to Cohanim, who went to the

---

[11]    We note briefly that appellant's toxicology expert Bello testified the men's description of the color of the smoke was not determinative, because people's perceptions are subjective and recollections may change. We also note and discuss in the next section below the bases for inferring that pesticides in addition to Alpine Dust were in the smoke.

back of Beauty to see what was wrong. He asked what had happened and appellant explained. Cohanim thought about it and feared there was a fire next door in Starbucks. He told this to appellant and they went to Starbucks together. They then banged on the door. Cohanim testified no one paid any attention when he and appellant knocked on the door, and so Cohanim suggested they should go and call Starbucks. Appellant did so. Because Ortiz did not mention there was a second man with Cohanim when he was knocking on the door, it is reasonable to infer that the knocking continued for some period before Ortiz heard it and after appellant left to call Starbucks.

Terminix also contends appellant stated at his deposition that the smoke still kept coming out even after he and Cohanim knocked on the Starbucks door, but the application was complete at that time. This, Terminix contends, shows the smoke could not have been caused by Ortiz's application because Ortiz testified he had completed the treatment when the knocking began. We do not see how appellant could have observed smoke coming into Beauty's bathroom when he was outside in front of Starbucks. If we were to take it as true as Terminix suggests we do, we would then disregard Ortiz's testimony as conflicting. Specifically, Cohanim testified when he and appellant knocked, the people inside the Starbucks were at the back, which was the area where the treatments were being applied. Ortiz testified he was in the center restaurant room after he completed his treatments. Thus, viewing the evidence in the light most favorable to the verdict, appellant's testimony would show they knocked while the treatment was ongoing.

41

B. *The Evidence Supports a Reasonable Inference That the Smoke Was Composed of Alpine Dust and Other Pesticides Applied by Terminix*

Terminix contends there is no evidence of the composition of the "smoke." As we have just explained, it is reasonable to infer the smoke contained Alpine Dust, based on the timing and location of its application. Terminix acknowledges that in denying the JNOV motion, the trial court relied on Terminix's destruction of evidence, which permitted the jury to infer that the evidence would have been unfavorable to Terminix, particularly in showing the presence of other pesticides in the smoke. Terminix contends there was no evidence that it "destroyed" Ortiz's work order or the residue in the bathroom, and without intentional destruction of evidence the instruction permitting a negative inference did not apply. As we discuss above in connection with the new trial order, there is ample evidence to support that instruction and an inference therefrom and so the instruction was proper.

In its reply brief, for the first time, Terminix argues even if the suppression of the evidence instruction was proper, certain specific inferences were not, based on the nature of the destroyed evidence. Terminix did not attack the specific inferences drawn by the trial court, only the sufficiency of the evidence to support a finding of suppression. As we stated above, " ' " 'Obvious considerations of fairness in argument demand that the appellant present all of his [or her] points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his [or her] opportunity to answer it or require the effort and delay of an additional brief by permission.' " ' " (*High Sierra, supra,* 29 Cal.App.5th at p. 111, fn. 2.) That is particularly appropriate

42

where, as here, Terminix repeatedly argues that Plaintiff "fails to explain." Appellant had no obligation to explain any specific inference by the trial court because Terminix did not challenge any specific inference by the trial court in its opening brief. Terminix simply argued no inferences were permitted at all because no evidence was destroyed.

C.     *Appellant Presented Substantial Evidence of Medical Causation*

As set forth in detail in the background section above, Dr. Brautbar provided substantial evidence of generic causation and Dr. Berman provided substantial evidence that appellant suffered injuries which Terminix's pesticides were capable of causing.

Terminix contends Dr. Brautbar "specifically denied any opinion as to whether the chemicals to which [appellant] could potentially have been exposed were capable of causing, or did cause, permanent loss of taste and smell." That Dr. Brautbar limited his testimony to a discussion of generic causation is irrelevant given Dr. Berman's testimony about appellant's specific injuries, including his testimony that appellant's nerve damage could not be remedied. We reject Terminix's contentions about Dr. Brautbar's limited testimony.

Terminix also contends Dr. Berman was not asked "*whether* he believed, to a reasonable degree of medical probability, that any particular chemical or combination of chemicals caused [appellant] to suffer a permanent loss of smell and taste." Terminix is mistaken as to medical probability. Berman was asked: "All of your opinions today have been within a reasonable degree of medical probability?" He replied: "Without a doubt."

## DISPOSITION

The order denying Terminix's JNOV motion is affirmed. The order granting a new trial is reversed. Appellant is awarded costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, P. J.

We concur:


WILEY, J.


HARUTUNIAN, J.[*]

---

[*]    Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.